# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        **Plaintiff,**

    v.                                      **Case No. 15-CR-146**

**DEVON BEAN**
        **Defendant.**

## DECISION AND ORDER

The police seized defendant Devon Bean for an alleged parking violation, locating drugs and a firearm while searching his person and car. Charged with possession of a firearm as a felon, 18 U.S.C. § 922(g)(1), and possession of marijuana with intent to distribute, 21 U.S.C. § 841(a)(1), defendant moved to suppress the contraband, arguing that the police violated his Fourth Amendment rights. The motion must be denied given the Seventh Circuit's recent decision endorsing seizures for suspected parking violations. See United States v. Johnson, No. 15-1366, 2016 U.S. App. LEXIS 9004 (7th Cir. May 17, 2016).

### I. FACTS AND BACKGROUND

The magistrate judge handling pre-trial proceedings in this case held an evidentiary hearing on defendant's motion, receiving testimony from Milwaukee Police Officers Jose Ramirez, Phillip Ferguson, and Vincenzo Paolo. The officers testified that on the evening of January 17, 2015, they were patrolling the 2400 block of West Hopkins Street, a high crime area. (Evid. Hr'g Tr. [R. 22] at 6-7, 55, 79.) Ramirez indicated that this was a "hot spot," with lots of drug activity, shootings, and robberies. (Tr. at 7.) Ramirez had made at least 10 drug-related arrests in the area, explaining that subjects tended to loiter on foot or sit in vehicles

outside a liquor store on that block, offering narcotics to people going inside. (Tr. at 10.) Ferguson testified that he had made about 10 arrests for drug and firearm offenses in the area. (Tr. at 86.)

As the officers traveled eastbound on West Hopkins (Tr. at 13, 55, 80; Def.'s Ex. 1001), with Ramirez driving, Ferguson seated in the front passenger seat, and Paolo in the rear passenger seat (Tr. at 12, 75, 83), they observed a black Dodge Avenger parked, with the engine running (Tr. at 33, 83), on the north side of Hopkins facing westbound (Tr. at 55, 80), about 15 feet east of the liquor store (Tr. at 51, 68), between two "No Parking Loading Zone" signs (Tr. at 12, 55; Govt.'s Ex. 2-5, 7, 10).[1] An older man was leaning into the front passenger window. (Tr. at 12, 55, 80.) Ramirez used the squad's spotlight to illuminate the interior of the car, and the officers observed hand-to-hand contact between the driver, later identified as defendant, and the man leaning inside the front passenger window. (Tr. at 12.) The officers suspected a drug transaction, but they saw no exchange of any item. (Tr. at 71.) Both subjects looked up, and the man leaning inside the car quickly turned around and began walking away from the vehicle. Ramirez and Ferguson testified that they were 20-30 feet from the Dodge Avenger when they made these observations. (Tr. at 13, 83.) The officers further indicated that they were initially moving at about 35 mph, but Ramirez slowed down to about 15-20 mph as he approached the liquor store, as he customarily did so he could see what was

---

[1]There was also a "No Loitering Or Prowling" sign in front of the liquor store (Govt.'s Ex. 5), but Officer Ramirez testified that sign did not contribute to the basis for the stop. (Tr. at 43.) Ramirez admitted that he could not see the first "no parking" sign while driving eastbound, but he knew this was a no parking/loading zone from his experience patrolling the area. (Tr. at 34; see also Govt.'s Ex. 2.) It was dark at the time of the stop (about 7:30 p.m., Def.'s Ex. 1006 at 1), but Ramirez testified that there was a streetlight near where the Dodge Avenger was parked; one of the "no parking" signs was attached to the light-post. (Tr. at 45; Govt.'s Ex. 6; Def.'s Ex. 1005.) However, the dome light was not on inside the Avenger. (Tr. at 50.)

2

going on there. (Tr. at 13, 88-89.)

On making these observations, Ramirez activated the squad lights, switched lanes into the oncoming traffic lane, and positioned the squad directly in front of the Dodge Avenger, bumper to bumper, about five feet away. (Tr. at 14; Def.'s Ex. 1007.) Ramirez testified that he positioned the squad this way because he anticipated the subjects would run, and he wanted get as close as possible. (Tr. at 14.) The officers exited the squad car[2] and Ramirez told the older man to stop, but the man squeezed between a fence and a building and took off running. (Tr. at 15, 74, 80, 91.) Ramirez did not pursue, because he knew from experience that he could not squeeze through this space with his duty belt. (Tr. at 15.)

The officers approached the vehicle, observing the driver reaching between his feet towards the floor board, as if to conceal an object.[3] (Tr. at 18.) As Ramirez approached the passenger side door, the window of which was open, he smelled the odor of fresh marijuana emanating from the inside of the vehicle. (Tr. at 19.) Ferguson and Paolo approached the driver's side door and ordered defendant out. (Tr. at 20, 58.) Paolo searched defendant, locating a clear plastic bag containing 41 individually wrapped bags of suspected marijuana in defendant's left front sweatshirt pocket. (Tr. at 61.) Ferguson recovered a Glock 9 mm pistol

---

[2]Ramirez testified that the officers did not draw their service weapons on exiting the squad. (Tr. at 49.) Ferguson could not recall if he drew his weapon. (Tr. at 104.)

[3]Officer Paolo testified that he saw the driver making furtive movements before the squad car came to a stop. (Tr. at 63-64.) The other officers testified that they made such observations as they approached the Avenger on foot, after the traffic stop. (See Tr. at 64, 84, 92; Def.'s Ex. 1006 at 5.) Paolo was seated in the back seat of the squad car, on the passenger side. (Tr. at 70, 75.) Given the brief period of time the officers were able to observe the Avenger before the stop, and given Ramirez and Ferguson's superior vantage point, I credit the testimony of Ramirez and Ferguson that the officers observed furtive movements after the stop.

3

with an extended magazine from underneath the driver's seat. (Tr. at 61-62, 85.)

On cross examination, Ramirez admitted that parking in the zone where he saw defendant's car is permissible for actively loading or unloading merchandise, property, or people (Tr. at 34), and that he would like to take a little longer than one or two seconds to make a determination that someone was violating a loading zone (Tr. at 35). Ferguson also admitted that a vehicle can legally park at that location if it's a loading situation. (Tr. at 97.) He testified the officers observed the Avenger for "seconds" before the stop. (Tr. at 96.) The officers did issue defendant a ticket for parking in a loading zone. (Tr. at 45, 86.)

The magistrate judge recommended that the motion to suppress be denied, agreeing with the government that the police had probable cause to stop defendant for a parking violation under a state statute providing that:

> No person shall stop or leave any vehicle standing in any of the following places except temporarily for the purpose of and while actually engaged in loading or unloading or in receiving or discharging passengers and while the vehicle is attended by a licensed operator so that it may promptly be moved in case of an emergency or to avoid obstruction of traffic:
>
> (1) In a loading zone. . . .

Wis. Stat. § 346.53(1).[4] The magistrate judge acknowledged that the officers observed the Avenger for just a few seconds before they made the traffic stop but concluded that the Fourth Amendment did not require the officers to wait in order to discount the possibility that defendant was actively loading or unloading. The magistrate judge declined to address whether the

---

[4]The statute also applies to persons parked in an alley in a business district; within 10 feet of a fire hydrant; within 4 feet of the entrance to an alley or a private road or driveway; and closer than 15 feet to a crosswalk.

4

officers had reasonable suspicion for a Terry stop based on suspected drug activity.[5]

Defendant objected to the recommendation, arguing that the police lacked grounds to believe he was parked illegally based on their brief observation of his running and attended car, stopped in a loading zone near an open business, with a pedestrian nearby. In its response, the government argued that the stop was justified based on all the circumstances, including the nature of the area, the apparent hand-to-hand transaction with a man who ran away on seeing the police, defendant's furtive gesture in bending down toward the floorboard, and the strong odor of fresh marijuana, in addition to defendant's apparent parking violation in front of the liquor store. In reply, defendant argued that the government abandoned these other justifications for the stop by not arguing them before the magistrate judge, instead focusing on the parking violation. Defendant further noted that the government could not rely on observations the officers made after the stop, such as the older man's flight, defendant's furtive movements, and the odor of marijuana in the car.

I directed the parties to file supplemental briefs addressing precisely when defendant was seized for Fourth Amendment purposes. See United States v. Clements, 522 F.3d 790, 794-95 (7th Cir. 2008) (discussing alleged seizure of stopped car). I then continued the matter for a decision from the Seventh Circuit addressing whether an alleged parking violation alone justifies a stop. The court recently decided that case, United States v. Johnson, No. 15-1366, 2016 U.S. App. LEXIS 9004 (7th Cir. May 17, 2016), and I allowed the parties to file supplemental memoranda. The matter is now ready for decision.

---

[5]See Terry v. Ohio, 392 U.S. 1 (1968) (holding that police may conduct brief investigative detention to verify or dispel reasonable suspicion that the person is engaged in criminal activity).

5

## II.  DISCUSSION

Because defendant timely objected to the magistrate judge's recommendation, my review is de novo.  Fed. R. Crim. P. 59(b).  De novo review does not require a de novo hearing, see United States v. Raddatz, 447 U.S. 667, 674 (1980), and the parties agree that the material facts are not in dispute.

In resolving this motion, I must determine (1) when the police seized defendant, and (2) whether the officers, at the time of the seizure, had reasonable suspicion or probable cause. See United States v. Odum, 72 F.3d 1279, 1284 (7th Cir. 1995) (holding that the court considers only the facts available to the police at the moment of the seizure).  On review of the undisputed facts, I find that the police seized defendant when they pulled in front of his car with flashing lights; I further find that, under Johnson, the officers had grounds to seize defendant for an alleged parking violation.

### A.    A Seizure Occurred When the Officers Pulled in Front of Defendant

Courts recognize three types of police/citizen encounters: (1) an arrest, which requires probable cause to believe that a person has committed or is committing a crime; (2) an investigatory stop, which requires specific and articulable facts giving rise to a reasonable suspicion that a person has committed or is committing a crime; and (3) a voluntary encounter, which requires no suspicion at all and does not constitute a seizure under the Fourth Amendment.  See, e.g., United States v. Rodriguez, 69 F.3d 136, 141 (7th Cir. 1995); United States v. Withers, 972 F.2d 837, 841 (7th Cir. 1992).  In determining whether a Fourth Amendment seizure has occurred, the court applies an objective standard, asking whether, taking into account all of the circumstances surrounding the encounter, the police conduct

6

would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business. United States v. Smith, 794 F.3d 681, 684 (7th Cir. 2015).

The testimony in this case establishes that the officers seized defendant when they turned on their squad's emergency lights, pulled into the oncoming lane of travel, and stopped a few feet in front of his car, bumper to bumper, blocking from him moving forward and driving away. In resisting this conclusion, the government contends that defendant could have backed away if he wanted to leave, but the Seventh Circuit rejected a similar contention in Smith, noting that common sense dictates that a reasonable person would not feel free to dodge the police. See id. at 686. The court further noted that the police:

> need not totally restrict a citizen's freedom of movement in order to convey the message that walking away is not an option. . . . Although it was theoretically possible for [the defendant] to extricate himself from the situation by reversing course, the officers' positioning nonetheless was sufficient to communicate to a reasonable person that he was not free to leave.

Id.

That defendant's car was already stopped when the police pulled up does not change the analysis. In their supplemental briefs, I directed the parties to address Clements, a case in which the police, responding to a call for service, pulled up 15-20 feet behind the defendant's car, which had been idling in front of the caller's house for several hours, in order to investigate. 522 F.3d at 792, 794. The officers activated the squad lights for identification and safety purposes but did nothing else that would have made the defendant feel that his freedom was restrained, such as drawing weapons, blocking the car from driving away, or using forceful language or tone of voice. Id. at 795. In the present case, the officers shined a spotlight on defendant's car, abruptly crossed into the oncoming lane of traffic, and pulled in front of defendant's car, bumper to bumper, preventing him from driving away. See Smith, 794 F.3d

7

at 686 (explaining that a seizure "can occur absent physical contact such as when police activate a siren or flashers, or, as in this case, when police act aggressively to block [a person's] course or to control his direction or speed") (internal quote marks omitted); United States v. Windom, No. 10-cr-30074, 2010 U.S. Dist. LEXIS 115370, at *3 (S.D. Ill. Oct. 29, 2010) (finding that police seized the defendant when officer activated lights, pulled up, and parked at an angle directly in front of the defendant's idling car, such that the defendant could not pull straight away).

While the standard is an objective one, my finding is "consistent with the officers' own contemporaneous and subsequent descriptions of the encounter." Smith, 794 F.3d at 686. Specifically, in his report, Officer Ferguson wrote: "PO RAMIREZ activated the lights and a traffic stop was conducted at 2434 W Hopkins St." (Def.'s Ex. 1006 at 5.) At the hearing, Ferguson consistently testified that Ramirez effected the traffic stop by turning on the squad lights and parking in front of the Avenger. (Tr. at 89.) Ferguson further testified that by the time the officers exited the squad they had executed a traffic stop. (Tr. at 97.) Ramirez likewise testified that he turned on the emergency lights and pulled into the oncoming traffic lane to effect the traffic stop. (Tr. at 24.) Ramirez also explained that he pulled close to defendant's car so the subjects would not get much of a lead if they took off running, and he immediately ordered the older man to stop after he exited the squad. (Tr. at 14-15.) Finally, Officer Paolo testified that after the officers observed the hand-to-hand contact, they turned on the squad lights and attempted to conduct a stop. (Tr. at 56.)

The government contends that in this case the officers used the term "traffic stop" to refer to the officers' vehicle having stopped, rather than a stop of defendant's vehicle. However, the government points to no testimony supporting this theory, which runs counter to

8

the manner in which the term "traffic stop" is customarily used. See, e.g., United States v. Shields, 789 F.3d 733, 744 (7th Cir.) (collecting cases characterizing traffic stops as a form of investigative stop), cert. denied, 136 S. Ct. 420 (2015).

**B.    The Officers Had Grounds to Stop Defendant for a Parking Violation**

Having found that the officers effected a seizure when they pulled in front of defendant's car, I must determine whether, at that moment, the officers had reasonable suspicion or probable cause for the seizure. The government bears the burden of justifying a warrantless seizure. See, e.g., United States v. Uribe, 709 F.3d 646, 650 (7th Cir. 2013). In this case, the government has alternately defended this stop as justified by the alleged parking violation (alone) or by reasonable suspicion of drug-related activity (based on all the circumstances). The government's second argument substantially relies on observations the officers made after the stop. Under Johnson, however, the officers' pre-seizure observation of a possible parking violation justified the stop.

In Johnson, a divided Seventh Circuit panel affirmed the denial of a suppression motion on similar facts. In that case, Milwaukee police saw a car stopped within 15 feet of a crosswalk, which, like parking in a loading zone, is allowed only if the car is actually engaged in loading or unloading or in receiving or discharging passengers. 2016 U.S. App. LEXIS 9004, at *1 (citing Wis. Stat. §346.53(5)). One police car drew up parallel to the car, and another drew up behind. The police shined lights through the car's windows, observed one of the occupants (Johnson) trying to hide a firearm, pulled him out of the car, and arrested him for possession of the gun. Id.

The district court denied Johnson's motion to suppress, finding that the police had probable cause to stop the car for a parking violation, and then obtained grounds for arrest

9

when they saw the gun. Id. at *2. The court rejected Johnson's argument that the police could not have probable cause until they had observed the car long enough to know that it was not loading or unloading, as allowed by the statute, noting that the police need not negate all possible defenses before acting. "They can hand out tickets (or make arrests) and leave to the judicial process the question whether a defense applies." Id. The district court further found the officers' brief observation sufficient because the car's doors were closed; no one was getting in or out, walking away, or approaching; and no one was in the driver's seat. Id. at *2-3. The district court added that, whether or not the police had probable cause, there was enough evidence to justify a brief stop for the purpose of determining whether the stopped car was within the scope of the statutory exception. Id. at *3.

The Seventh Circuit panel affirmed, relying on Shields, 789 F.3d at 744-46, for the proposition "that probable cause to believe that a parking offense is ongoing justifies at least a brief stop."[6] 2016 U.S. App. LEXIS 9004, at *3. The panel further noted that the holding of Atwater v. Lago Vista, 532 U.S. 318 (2001) – that a fine-only offense may be followed by a custodial arrest – foreclosed any argument that police must refrain from making stops to enforce the parking code. Id. Finally, the panel noted that the police approach stopped cars countless times every day; sometimes they write tickets; sometimes they don't; if the car is

---

[6] In Shields, the police stopped the defendant for partially blocking a crosswalk. 789 F.3d at 738. The Seventh Circuit concluded: "Because the officers believed that Mr. Shields was in the process of committing a parking offense, they had, at a minimum, reasonable suspicion to believe that the law was being violated. . . . Because Mr. Shields does not dispute that he violated the Chicago Municipal Code by parking in the cross walk, the officers clearly had an objective basis to believe that he was violating the law. See United States v. Choudhry, 461 F.3d 1097, 1103-04 (9th Cir. 2006) (holding that a parking violation is sufficient to support an investigatory stop))." Id. at 745. Defendant does not concede violating Wis. Stat. § 346.53, so Shields does not control the present case.

10

occupied, the difference may depend on what the driver says. "The Fourth Amendment requires searches and seizures to be reasonable; it does not demand that police resolve all possible defenses and exceptions before asking the first question." Id. at *4.

Alternatively, the panel applied a form of inevitable discovery, finding that the police could have simply strolled up to this stopped car and made the same observations, and that exclusion of evidence would be too severe a remedy for the officers' use of more aggressive tactics. Id. at *5-7. The panel majority concluded:

> So although we agree with the district court that, given Shields, the police had at least reasonable suspicion to stop the parked car long enough to find out what was going on, we also conclude that the police would have discovered the same evidence without a seizure (because any officer was free to walk up to the parked car, which lacking a driver was not going anywhere), and that exclusion of evidence in a criminal prosecution would be the wrong remedy for the harmless steps of using extra cruisers and excessive lighting.

Id. at *7.[7]

Thus, Johnson holds that the police may conduct at least a brief stop in order to investigate a possible parking violation, without waiting to see for themselves whether the driver was actively loading or unloading. Defendant attempts to distinguish Johnson, noting that his car was not "just sitting there." Id. at *2. Rather, he was behind the wheel at the time of the stop, in front of an open store, with a person standing by the passenger door. But the car in Johnson was also stopped in front of a liquor store, with the motor running. Id. at *11

---

[7]In a powerful dissent, Judge Hamilton found it unreasonable for the officers to use such highly intrusive tactics to investigate a suspected parking violation. Id. at *8. Judge Hamilton further warned against the extension of Terry and Whren v. United States, 517 U.S. 806 (1996) (allowing pretextual traffic stops) to suspected parking violations. Id. at *14. As discussed above, while the officers in this case seized defendant for parking in a loading zone, they were motivated to act by the suspected drug activity outside the liquor store. On the other hand, the methods employed by the officers here were not as intense as in Johnson, and the officers did have at least some basis for suspecting criminal activity at the time of the stop.

11

(Hamilton, J., dissenting). Further, the presence or absence of the driver cannot be dispositive, as the statute requires the car be "attended," not that it be "occupied." See id. at *16-17 (Hamilton, J., dissenting). If, under Johnson, the police do not have to wait and see whether the driver of an idling car has simply run into the store to buy something, they also do not have to wait and see if a driver behind the wheel is picking up or dropping off passengers. And, while there was a person standing outside the car in this case, the officers did not see him get into or out of the car.

As in Johnson, the officers in this case had, at least, reasonable suspicion to temporarily seize defendant to investigate the possible parking violation. Defendant makes no claim that the officers violated his rights by further ordering him out and searching his person and car based on their additional observations of the other man running away, defendant's furtive movements, and the odor of marijuana coming from the car. See, e.g., United States v. Patterson, 65 F.3d 68, 71-72 (7th Cir. 1995); United States v. Evans, 994 F.2d 317, 321 (7th Cir. 1993).

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 29) is adopted, and defendant's motion to suppress (R. 13) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 17th day of June, 2016.

/s Lynn Adelman
LYNN ADELMAN
District Judge